Jeffrey N. Walker (5556)
walker@holwalk.com
Chase M. Walker (15393)
cwalker@holwalk.com
**HOLMAN WALKER, LC**
9533 South 700 East, Suite 100
Sandy, Utah 84070
Telephone: (801) 990-4990

Attorneys for Plaintiff Randy W. Fellows

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RANDY W. FELLOWS, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>DAN R. SUNDAHL; an individual; EQUIFUND CAPITAL, INC., a Utah corporation; TERRY M. DERU, an individual; BELSEN GETTY, LLC, a Utah limited liability company; PAUL M. HALLIDAY, Jr., an individual; HALLIDAY, WATKINS & MANN, P.C., a Utah professional corporation; and DOES 1-50,<br><br>Defendants. | **COMPLAINT**<br><br>Civil No.  2:16-cv-00785<br><br>Judge: Jill N. Parrish |

Plaintiff Randy W. Fellows, by and through his attorneys of record, Holman Walker,

allege causes of action against defendants as follows:

**TABLE OF CONTENTS**

**THE PARTIES**................................................................................................................3

**JURISDICTION AND VENUE**.....................................................................................4

**GENERAL ALLEGATIONS** ........................................................................................6

Deru's Connection to the Fraud ..................................................................6

Sundahl's Connection to the Fraud ............................................................7

The Vernal Investment ..............................................................................9

The Model Home Transactions ................................................................12

The Chicken Plant Investment .................................................................14

The Dinar Trading Investment .................................................................20

The Dinars for Oil Investment .................................................................24

**FEDERAL LAW CAUSES OF ACTION** ............................................24

FIRST CAUSE OF ACTION (Private Right of Action under the Exchange
Act for Fraud in Connection with the Purchase and Sale of Securities) Violations
of Section 10b of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b)
and 17 C.F.R. § 240.10b-5] ......................................................................27

SECOND CAUSE OF ACTION (Private Right of Action under the Securities Act
for the Offer and Sale of Unregistered Securities) Violation of Sections 5(a), 5(c)
and 12(a)(1) of the Securities Act) [15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1)] ....................28

THIRD CAUSE OF ACTION (Private Right of Action under the Securities Act
for the Recession of Offer and Sale of Unregistered Securities) Violation of
Section 12(a)(2) of the Securities Act [15 U.S.C. § 771(a)(2)] .......................................29

**PENDANT STATE LAW CAUSES OF ACTION** ..................................30

FOURTH CAUSE OF ACTION (Right of Private Action under Utah Securities
Act for the Sale of Securities by Means of Untrue Statements and Material
Omissions) [Utah Code §§ 61-1-22 and 61-1-1(2)] .................................................30

FIFTH CAUSE OF ACTION (Right of Private Action under Utah Securities
Act for Failure to Register)[Utah Code §§ 61-1-22 and 61-1-7] ..............................33

SIXTH CAUSE OF ACTION (Fraudulent Transfer) [Utah Code Ann.
§ 25-6-1, et seq., [UFTA]] ......................................................................35

**COMMON LAW CAUSES OF ACTION** ............................................35

SEVENTH CAUSE OF ACTION (Fraudulent Misrepresentation) .......................................35

EIGHTH CAUSE OF ACTION (Fraudulent Inducement and Recession) ...........................37

NINTH CAUSE OF ACTION (Promissory Estoppel)........................................................38

TENTH CAUSE OF ACTION (Civil Conspiracy) ...............................................................39

ELEVENTH CAUSE OF ACTION (Breach of Contract) ...................................................40

TWELFTH CAUSE OF ACTION (Fraud)............................................................................42

THIRTEENTH CAUSE OF ACTION (Piercing the Corporate/LLC Veil;
Alter Ego)................................................................................................................................43

**PRAYER FOR RELIEF** ...........................................................................................................47

**JURY DEMAND**....................................................................................................................48

## THE PARTIES

1.      Plaintiff Randy W. Fellows ("Fellows") is an individual who at all times relevant herein was living in Salt Lake County, Utah. Fellows is a Utah general contractor.

2.      Upon information and belief, defendant Dan. R. Sundahl ("Sundahl") is an individual who at all times relevant was living in Davis County, Utah.

3.      Upon information and belief, defendant Equifund Capital, Inc. ("Equifund Capital") is a Utah corporation with its principal place of business located at 883 East 450 South, Kaysville, Utah 84037. Based on information and belief, at times relevant herein, Sundahl was the sole owner and control person for Equifund Capital. Equifund Capital was administrative dissolved as of January 31, 2011 as a result of Sundahl's failure to file the requisite annual report.

4.      Upon information and belief, defendant Terry M. Deru ("Deru") is an individual who at all times relevant was living in Davis County, Utah.

5.      Upon information and belief, defendant Belsen Getty, LLC ("Belsen Getty") is a Utah limited liability company with its principal place of business located at 1565 West Hill Field Road, Suite 103, Layton, Utah 84041. Based on information and belief, at all times relevant herein, Deru was the registered agent, member, and general manager of Belsen Getty.

6.      Upon information and belief, Paul M. Halliday, Jr. ("Halliday") is an individual who at all time relevant was living in Salt Lake County, Utah. Halliday is an attorney practicing law in Utah.

7.      Upon information and belief, Halliday, Watkins & Mann, P.C. ("HW&M") is a Utah professional corporation with its principal place of business located at 376 East 400 South, Suite 300, Salt Lake City, Utah 84111. Based on information and belief, HW&M is the successor to Halliday & Watkins, P.C., a Utah professional corporation, Halliday & Halliday, P.C., a Utah professional corporation, and Halliday, Watkins & Henrie, a Utah professional corporation. Based on information and belief, at all relevant, Halliday was the registered agent, president, director, and shareholder of HW&M.

8.      Defendants Does 1 through 50 are certain known and unknown individuals and/or entities having knowledge regarding allegations in this complaint and/or who might have been involved in acts or omissions related to the claims set forth herein for which plaintiff have legal and/or equitable claims. Fellows will amend this complaint if and when the names of any such additional parties are identified through discovery.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Section 10b of the Securities and Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b) and Rule 10b-5

promulgated thereunder by the Securities and Exchange Commission (the "Commission") (17 C.F.R. § 240.10b-5)), Sections 5, 12(a)(1) and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77e, 77l(a)(1), and 77l(a)(2)), as well as the Utah Uniform Securities Act, Utah Code § 61-1-1, et seq. (the "Utah Securities Act"), the Uniform Fraudulent Transfer Act, Utah Code § 25-6-1, et seq. (the "UFTA"), and the common law.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

11.     Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce, including, but not limited to, the mails, text messaging, emails, and facsimiles, in connection with the transactions, acts, and course of business alleged herein, certain of which occurred within the District of Utah.

12.     Venue for this action is proper in the District of Utah under Section 27 of the Exchange Act (15 U.S.C. § 77aa) and Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)) because certain of the transactions, acts, practices, and course of business alleged in this complaint took place in this district and because of the defendants reside in and transact business in this district.

13.     Defendants' conduct, singly and in concert, took place in connection with the offer, purchase, and/or sale of investment opportunities, which are securities.

## GENERAL ALLEGATIONS

**Deru's Connection to the Fraud.**

14.     In or about 2006, Deru contacted Fellows about assisting him in the investment of Fellows' retirement funds through his company, Belsen Getty. Deru represented to him that he was a licensed investment adviser with significant skills in managing and investing retirement funds. Deru represented that he and his company, Belsen Getty had a long successful track record of investments and was very well respected in the investment community.

15.     During this time, Deru also assured Fellows that he was someone he could trust, in part, as he was a devout member of The Church of Jesus Christ of Latter-day Saints and had held over a dozen significant positions as a lay clergy member, including serving a LDS mission in France and Belgium.

16.     During this time, Fellows told Deru that he was only interested in low-risk investments, as these monies would be coming from his retirement fund. Deru assured him that he understood perfectly what kind of investments would suit Fellows' wants and needs. Deru further assured Fellows that he would only invest these retirement funds with companies that had at least a ten (10) year track record of solid gains and low-risk due to their previous performance.

17.     Ultimately Fellows invested approximately $500,000 from his retirement account (the majority of those funds) with Deru. Deru initially invested these retirement funds in a diverse portfolio of investments that in 2006 and 2007 generated approximately eight percent (8%) return annually. Deru was paid a yearly one percent (1%) fee to manage and invest these retirement funds.

6

18.     In or about mid-2008, Deru met with Fellows where he told him that the returns that Fellows had received in 2006 and 2007 for Fellows' retirement funds were "not going to work going forward" due to changes in the investment markets. At this time, Deru told Fellows that he would look for new investment opportunities for Fellows to move his retirement funds. At this time, Deru assured Fellows that he would only look for investments that were low-risk, as Fellows had required.

19.     In or about September 2008, Deru contacted Fellows telling him that he had indeed found a "perfect" investment for Fellows to consider moving some of his retirement funds into. Fellows agreed to meet to discuss this investment opportunity.

**Sundahl's Connection to the Fraud.**

20.     In or about September 2008, Fellows met at Deru's office to discuss this "new investment opportunity." At this meeting Deru introduced him to Sundahl, who he told him was a business colleague who had a proven track record of successful investments. Deru fully endorsed Sundahl to Fellows at this meeting assuring him that he "knows how to make money, in up markets and down."

21.     During this initial meeting, Deru further represented to Fellows that Sundahl was a prominent business adviser who ran a very successful investment company, Equifund Capital.

22.     During this time, Deru knew or should have known and failed to tell Fellows that Equifund Capital did not even exist, as Sundahl did not incorporate Equifund Capital until October 2009, more than a year later. *See* Ex. A attached.

23.     At all time relevant herein, Deru continued to assure Fellows as his financial adviser that Sundahl was someone he and correspondingly Fellows should trust. These

representations were premised on Deru's continued representations that he was both an honest and trusted financial planner with a sterling record in the community.

24.    Deru failed to inform Fellows that during relevant times herein he (Deru) was under investigation and then charged by the Commission for securities fraud pursuant to section 17(a) of the Securities Act, section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and section 206 of the Investment Advisers Act of 1940 for claims of fraud in the offer and sale of an investment opportunities using his company, Belsen Getty.

25.    Deru further failed to inform Fellows that during relevant times herein the Commission had instituted a cease-and-desist proceeding against him arising from the above-noted investigation.

26.    Deru further failed to inform Fellows that during relevant times herein sanctions and a cease-and-desist order had been entered against him by the Commission arising from the above-noted cease-and-desist proceeding, whereby Deru was barred from any association, in pertinent part, with any broker, dealer or investment adviser.

27.    Deru further, knew or reasonable should have known that Sundahl had been convicted in Utah on multiple counts of securities fraud in 2001 and attempted communications fraud in 2002.

28.    At no time did Deru inform Fellows that Sundahl had been convicted in Utah on multiple counts of securities fraud in 2001 and attempted communications fraud in 2002.

29.    At this initial meeting between Deru, Fellows and Sundahl, Deru represented to Fellows that Sundahl had identified an investment opportunity perfectly suited to Fellows. He

further told Fellows that he and Sundahl had discussed the conservative and low-risk criteria that

Fellows wanted to invest his retirement funds.

30.     At this initial meeting, Sundahl represented to Fellows that he indeed had an

investment opportunity perfectly suited to the conservative and low-risk criteria that Fellows

articulated. However, as this investment opportunity was so "desirable and sought after," that

Fellows would have to sign a "Non-Disclosure, Non-Circumvention, and Non-Competition

Agreement" (the "NDA") before Sundahl could even tell Fellows about the investment

opportunity.

31.     Fellows agreed and executed the NDA.

**The Vernal Investment.**

32.     After executing the NDA, Sundahl and/or Deru solicited Fellows to be an investor

in a land development deal in Vernal, Utah he was putting together (the "Vernal Investment").

33.     Based on information and belief, Sundahl and/or Deru assured Fellows on the

appropriateness of the Vernal Investment to Fellows based on Fellows' profession as a contractor.

34.     Sundahl an/or Deru represented to Fellows that the Vernal Investment was

perfectly suited to Fellows' criteria for a conservative, low-risk investment opportunity.

35.     Sundahl and/or Deru represented that the Vernal Investment was the perfect

investment for Fellows retirement funds as it would be fully secured by real property.

36.     Sundahl and/or Deru represented to Fellows that the Vernal Investment was not

just a "low-risk" opportunity, but that there it posed "no risk."

37.     Sundahl and/or Deru represented that the Vernal Investment posed "no risk" as

the many investors were all investing cash and that the Vernal Investment would have no debt.

38.     Sundahl and/or Deru represented that Fellows needed to invest a minimum of $250,000 to participate in the Vernal Investment.

39.     Sundahl and/or Deru represented that there was only one "slot" for a final investor of $250,000 and that if Fellows did not act immediately another interested investor would take that slot.

40.     Sundahl and/or Deru presented to Fellows a diagram that represented just how the Vernal Investment would generate significant returns on Fellows' $250,000 investment (the "Diagram"). *See* Ex. B attached.

41.     Pursuant to the Diagram, Sundahl and/or Deru further represented and marketed the Vernal Investment to Fellows promising that in addition to the return of his investment, he would receive profits totaling $836,152 over the following three years as follows:

        a.      Year One: The first payment would include the original investment of $250,000, plus $33,400 in profits;

        b.      Year Two: The second payment in the amount of $401,680 in profits; and

        c.      Year Three: The third payment in the amount of $401,072 in profits.

42.     Sundahl and/or Deru represented that the reason that such a great return was possible was that the Vernal Investment was to be divided and sold off in increments thereby generating significant profits. This included part of the project having a gravel pit that would immediately generate profit as the gravel was "pre-sold" to the oil drilling industry and only needed to be loaded and invoiced to various parties.

43.     Sundahl and/or Deru represented that the amount of the return as represented on the Diagram, as well as the timetable for such payments (over three years) was merely the

minimum that Fellows would make and that it was very likely that he could make significantly more on an even faster timetable.

44.     Sundahl and/or Deru represented that not only was the Vernal Investment perfected suited to Fellows' needs, that Fellows could also be the general contractor for what was represented as more than 500 homes that would be built as part of the Vernal Investment.

45.     Based on information and belief, the real reason that Deru strongly recommended that Fellows make the $250,000 investment in the Vernal Investment was because Deru had cut a deal with Sundahl to receive a ten percent (10%) commission from the Retirement Fund Payment. Deru nor Sundahl ever told Fellows about this arrangement.

46.     Sundahl and/or Deru did not provide Fellows any additional written information pertaining to the Vernal Investment.

47.     Sundahl and/or Deru did not provide Fellows with a registration statement in accord with the Securities Act for the Vernal Investment.

48.     Sundahl and/or Deru did not provide Fellows with a private placement document in accord with any of the exemptions from registration under the Regulation D Rules (17 C.F.R. § 230.501, et seq.) for the Vernal Investment.

49.     Sundahl and/or Deru did not provide Fellows with an accredited investor questionnaire, verification or certification (self or otherwise) for the Vernal Investment.

50.     Sundahl and/or Deru did not request any verification from Fellows that he might be a qualified accredited investor for the Vernal Investment.

51.     Sundale and/or Deru did not provide or request any accredited investor confirmation for Fellows from an investment adviser, attorney, banker, CPA or other third-party qualified to so opine about Fellows' financial sophistication and basis for the Vernal Investment.

52.     At all times relevant Fellows was not an accredited or sophisticated investor.

53.     At all times relevant, Fellows reasonably relied on the representations from Deru about the trustworthiness of Sundahl for the Vernal Investment.

54.     At all time relevant, Fellows reasonably relied on the affirmative representations made by Sundahl and/or Deru pertaining to the appropriateness of the Vernal Investment for his retirement funds.

55.     Based on these representations by Sundahl and/or Deru, Fellows agreed to move $250,000 of his retirement funds into the Vernal Investment (the "Retirement Fund Payment"). *See* Ex. C attached.

56.     Fellows' investment by way of the Retirement Fund Payment in the Vernal Investment constituted a security under both federal and Utah law.

57.     Based on information and belief, Sundahl and/or Deru never filed for registration with the Utah Department of Commerce, Division of Securities for the sale of an interest in the Vernal Investment to Fellows as required pursuant to Utah Code Ann. § 61-1-1, et seq.

**The Model Home Transactions.**

58.     At the same time and to further induce Fellows to make the Retirement Fund Payment in the Vernal Investment, Sundahl told Fellows that he wanted to purchase model homes that Fellows was building claiming that he had already prearranged to have officers from Hill Air Force Base rent them.

59.     On December 30, 2008, at Sundahl's attorney, defendant Paul M. Halliday Jr.'s ("Halliday") office, Sundahl, through Equifund Capital, despite the fact that Equifund Capital was not even incorporated until October 2009, purchased the following two model homes (the "Model Homes") from Fellows (the "Model Homes Transaction"):

     a.     Lot 218 Scenic Cover, located at 11923 South Scenic Acres, Riverton, Utah 84096; and

     b.     Lot 214 King Benjamin, located at 1266 W. Mosiah Way, South Jordan Utah 84095.

60.     At the closing on the Model Homes, Sundahl informed Fellows that while neither he nor Equifund Capital had the money immediately available to close on the Model Homes Transaction, he and/or Equifund Capital would be getting the funds the following week.

61.     With this promise, as confirmed by Halliday, Fellows agreed to complete the Model Homes Transaction to Sundahl, through Equifund Capital, and transferred title accordingly.

62.     Sundahl nor Equifund Capital ever paid for the Model Homes.

63.     Fellows eventually found a buyer for the Model Homes in 2010.

64.     However, the sale of the Mode Homes in 2010 came at a loss to Fellows given that Sundahl/Equifund Capital had not purchased the Model Homes, as promised.

65.     Sundahl acknowledged that he and/or Equifund Capital's obligation to repay the difference lost by Fellows under the Model Homes Transaction, Sundahl and Equifund Capital executed two promissory notes, as follows:

a.      On April 7, 2010, Sundahl and Sundahl for Equifund Capital signed a promissory note in favor of Fellows on Lot 218 in the amount of $74,930.80 due May 7, 2010 with an interest upon default of twenty four percent (24%) (the "Lot 218 Note") *See* Ex. D attached; and

b.      On July 15, 2010, Sundahl and Sundahl for Equifund Capital signed a promissory note in favor of Fellows on Lot 214 in the amount of $107,375.67 due July 31, 2010 with an interest upon default of twenty-four percent (24%) (the "Lot 214 Note") *See* Ex. E attached. The Lot 218 Note and the Lot 214 Note may sometimes be collectively referred to as the "Model Home Notes").

66.      No payments were ever made on either of the Model Home Notes.

67.      Based on information and belief, the entire Model Homes Transaction was nothing more than a ruse by Sundahl.

68.      Based on information and belief, Sundahl would continue to use the assurances through late 2015 that payment on the Model Home Notes was forthcoming to induce Fellows not to commence collections on either the Model Home Notes or the Vernal Investment.

**The Chicken Plant Investment.**

69.      When the first return of the Vernal Investment came due in September 2009, Sundahl and/or Deru informed Fellows that payment as promised under the Diagram was taking just a little longer than anticipated and that Fellows just needed to be little patient and he would receive not only his investment back of $250,000, the first year's interest payment of $33,400, but most likely even more. Fellows asked just how long must he wait, he was told no more than 30 to 45 days. Fellows agreed to wait.

70.     For the rest of 2009 and into 2010, Sundahl and/or Deru repeated made promises to Fellows that the payments due under the Vernal Investment was just about available. Promise after promise was made, but no payments were received.

71.     In early 2010, Fellows met again with Sundahl and Deru about the Vernal Investment. At that time Sundahl and/or Deru represented that the investment opportunity for the property underlying the Vernal Investment had fallen through and that the Retirement Fund Payment had been moved to a chicken plant in Burley, Idaho (the "Chicken Plant"). This was the first time that Fellows knew anything about this change in use of the Retirement Fund Payment.

72.     At that time, Sundahl and/or Deru represented that the Chicken Plant was an even better investment than the Vernal Investment and would meet or exceed the investment returns promised in the Vernal Investment.

73.     At that time, Sundahl and/or Deru represented that the Chicken Plant had the backing of the Burley City Council, as well as County officials.

74.     At that time, Sundahl and/or Deru represented that the Chicken Plant would bring hundreds of jobs to Burley and that Burley was selected due, in material part, to the railroad access uniquely found in Burley, Idaho.

75.     Fellows was stunned and asked Sundahl and Deru for the return of his Retirement Fund Payment.

76.     At that time Sundahl and/or Deru refused to return the Retirement Fund Payment claiming that they did not have the funds to do so and further spent considerable time telling Fellows about the investment potential of the Chicken Plant.

15

77.     Sundahl and/or Deru also told at this time that because the Chicken Plant was a different investment, it would take longer for him to receive the initial return. However, Sundahl and/or Deru affirmatively assured Fellows that the initial return would be made; it would just be delayed.

78.     Based on information and belief, Sundahl and/or Deru did not tell Fellows that Sundahl and/or Deru had not invested the Retirement Fund Payment in the Chicken Plant.

79.     Based on information and belief, Sundahl and/or Deru did not tell Fellows that there was never an investment opportunity for the Chicken Plant in Burley for the Retirement Fund Payment.

80.     Based on information and belief, Sundahl and/or Deru did not tell Fellows that the proposed chicken farm in Burley, Idaho (the "Hy-Line Burley Chicken Farm") was being proposed by Hy-Line International and Hy-Line North America, a world leader in the poultry industry ("Hy-Line").

81.     Based on information and belief, neither Sundahl and/or Deru were ever associated with Hy-Line or the Hy-Line Burley Chicken Farm.

82.     Based on information and belief, the Hy-Line Burley Chicken Farm was never realized.

83.     Based on information and belief, Sundahl and/or Deru did not tell Fellows that there was no company at that time to have an ownership from the Retirement Fund Payment in the supposed Chicken Plant.

84.    On information and believe, Sundahl did not form a company for the supposed Chicken Plant until October 21, 2009 in Idaho under the name, "America's Fresh Poultry, Inc." with Sundahl as the incorporator, registered agent and CEO. *See* Ex. F attached.

85.    On information and belief, Fellows never was a shareholder in America's Fresh Poultry, Inc.

86.    On information and belief, America's Fresh Poultry, Inc. was administratively dissolved on January 13, 2010. *See* Ex. F attached.

87.    On information and belief, there is no evidence that there was ever a Chicken Plant owned by or through Sundahl and/or Deru.

88.    As a result of Sundahl and/or Deru telling Fellows that Equifund Capital did not have funds to return the Retirement Fund Payment, that the Retirement Fund Payment had been invested in purchasing the Chicken Plant (the "Chicken Plant Investment") and that he would still receive all of the investment promises that Sundahl and/or Deru had made pertaining to the Vernal Investment in the Chicken Plant Investment, only delayed, Fellows was left with no other option than to waited for the promised payments.

89.    Sundahl and/or Deru did not provide Fellows with any written information pertaining to the Chicken Plant Investment.

90.    Sundahl and/or Deru did not provide Fellows with a registration statement in accord with the Securities Act for the Chicken Plant Investment.

91.    Sundahl and/or Deru did not provide Fellows with a private placement document in accord with any of the exemptions from registration under the Regulation D Rules (17 C.F.R. § 230.501, et seq.) for the Chicken Plant Investment.

92.     Sundahl and/or Deru did not provide Fellows with an accredited investor questionnaire, verification or certification (self or otherwise) for the Chicken Plant Investment.

93.     Sundahl and/or Deru did not request any verification from Fellows that he might be a qualified accredited investor for the Chicken Plant Investment.

94.     Sundahl and/or Deru did not provide or request any accredited investor confirmation for Fellows from an investment adviser, attorney, banker, CPA or other third-party qualified to so opine for Fellows for the Chicken Plant Investment.

95.     At all times relevant Fellows was not an accredited or sophisticated investor.

96.     At all times relevant, Fellows reasonably relied on the representations from Deru about the trustworthiness of Sundahl about the Chicken Plant Investment.

97.     At all time relevant, Fellows reasonably relied on the affirmative representations made by Sundahl and/or Deru pertaining to the appropriateness of the Chicken Plant Investment for his retirement funds.

98.     Fellows' investment by way of the Retirement Fund Payment in the Chicken Plant Investment constitutes a security under both federal and Utah law.

99.     Based on information and belief, Sundahl and/or Deru did not file for registration with the Utah Department of Commerce, Division of Securities for the sale of an interest in the Chicken Plant Investment to Fellows as required pursuant to Utah Code Ann. § 61-1-1, et seq.

100.    On April 2011, Sundahl contacted Fellows and requested that he prepare payoff amounts for both the Vernal/Chicken Plant Investment and the Model Home Notes, informing Fellows that he had secured the funds necessary to bring these matters current.

101.    Fellows immediately prepared the requested payoffs and forwarded them to Sundahl for his approval and payment.

102.    Sundahl and/or Deru never made any payments under the Vernal/Chicken Plant Investment, or the Model Home Notes to Fellows at that time.

103.    In the ensuing months, when Fellows asked when the payments would be coming on the Vernal/Chicken Plant Investment, or the Model Home Notes, Sundahl and/or Deru repeatedly assured Fellow that they would be coming soon, but provided no specific dates.

104.    In March, April, and June of 2012, Sundahl again contacted Fellows affirming the obligations under the Vernal/Chicken Plant Investment and the Model Home Notes, and asked him to prepare payoff amounts because they were ready to payoff the amounts owed. However, each and every promised payoff did not take place.

105.    Sundahl and/or Deru made similar requests for payoffs of the Vernal/Chicken Plant Investment and the Model Home Notes through 2013 and into 2014. On each occasion, Fellows would prepare payoff amounts and forward them to Sundahl and/or Deru. On each occasion, after the time for the promised payment had passed Sundahl and/or Deru would contact Fellows, assuring and reaffirming that the payments under the Vernal/Chicken Plant Investment and the Model Home Notes would be made, but that Fellows needed to be a bit more patient.

106.    These communications are well documented and demonstrate Sundahl's and/or Deru's awareness of the obligations and affirmation that they still owed Fellows under the Vernal/Chicken Plant Investment, as well as the Model Home Notes.

**The Dinar Trading Investment.**

107.    In mid-2014, Sundahl and/or Deru, after making repeated promises that the Vernal/Chicken Plant Investment and the Model Home Notes would be paid at any time, met with Fellows and explained that his Retirement Fund Payment had been moved from the Vernal/Chicken Plant Investment into a "Dinar Trading Investment" (the "Dinar Trading Investment").

108.    At that time, Sundahl and/or Deru represented that the Dinar Trading Investment was an extremely confidential investment opportunity for only selected investors with inside connections to the international currency markets.

109.    At that time, Sundahl and/or Deru represented that the Dinar Trading Investment was so confidential that any mention of it to outsiders could result in being disqualified from any participation.

110.    At that time, Sundahl and/or Deru represented that the Dinar Trading Investment allowed them, using their inside connections, to purchase Iraqi Dinars for literally pennies and that the Dinars would be worth at least $2 US as soon as the United Nations recognized the Iraqi currency.

111.    At that time, Sundahl and/or Deru represented that, as democracy came to Iraq, it would only be a short time before the United Nations would recognize the Iraqi currency.

112.    At that time, Sundahl and/or Deru represented that they had partnered Halliday and his law firm, HW&M, in the Dinar Trading Investment to facilitate the trading and act as "paymaster" to assure that all trading profits were properly accounted for and forwarded to Fellows.

113.    At that time, Sundahl and/or Deru represented that not only was Halliday involved in the Dinar Trading Investment, but that Halliday's father, also a partner and principal at HW&M was involved in the Dinar Trading Investment with other investors and was the paymaster in controlling the funds being so traded.

114.    Based on information and belief, Halliday, Sundahl and/or Deru used the apparent legitimacy of his law firm, HW&M, to induce Fellows to agree that the Retirement Find Payment should be transferred into the Dinar Trading Investment.

115.    Fellows was surprised that Sundahl, Deru and/or Halliday were advising him to move his investment of the Retirement Fund Payment from the Vernal/Chicken Plant Investment to the Dinar Trading Investment and instead asked Sundahl and/or Deru for the return of his Retirement Fund Payment.

116.    In response Sundahl and/or Deru told Fellows that Equifund Capital did not have funds to return the Retirement Fund Payment, that the Retirement Fund Payment had already been invested in the Dinar Trading Investment and that he would still receive all of the investment promises that Sundahl and/or Deru had made pertaining to the Vernal/Chicken Plant Investment, in the Dinar Trading Investment, only delayed; Fellows was left with no other option than to waited for the promised payments now in the supposed Dinar Trading Investment.

117.    Sundahl, Deru and/or Halliday did not provide Fellows any written information pertaining to the Dinar Trading Investment.

118.    Sundahl, Deru and/or Halliday did not provide Fellows with a registration statement in accord with the Securities Act for the Dinar Trading Investment.

119.     Sundahl, Deru and/or Halliday did not provide Fellows with a private placement document in accord with any of the exemptions from registration under the Regulation D Rules (17 C.F.R. § 230.501, et seq.) for the Dinar Trading Investment.

120.     Sundahl, Deru and/or Halliday did not provide Fellows with an accredited investor questionnaire, verification or certification (self or otherwise) for the Dinar Trading Investment.

121.     Sundahl, Deru and/or Halliday did not request any verification from Fellows that he might be a qualified accredited investor for the Dinar Trading Investment.

122.     Sundahl, Deru and/or Halliday did not provide or request any accredited investor confirmation for Fellows from an investment adviser, attorney, banker, CPA or other third-party qualified to so opine for Fellows for the Dinar Trading Investment.

123.     At all times relevant Fellows was not an accredited or sophisticated investor.

124.     At all times relevant, Fellows reasonably relied on the representations from Deru about the trustworthiness of Sundahl and/or Halliday about the Dinar Trading Investment.

125.     At all times relevant, Fellows reasonably relied on the representations from Sundahl and/or Deru about the trustworthiness of Halliday and HW&M about the Dinar Trading Investment.

126.     At all time relevant, Fellows reasonably relied on the affirmative representations made by Sundahl, Deru and/or Halliday pertaining to the appropriateness of the Dinar Trading Investment for his retirement funds.

127.     Based on information and belief, the Dinar Trading Investment was a scam; there was no trading program for Dinars into US dollars.

128.    Based on information and belief, Sundahl, Deru and/or Halliday never invest any of the Retirement Plan Payment into the Dinar Trading Investment.

129.    Fellows' investment by way of the Retirement Fund Payment in the Dinar Trading Investment constitutes a security under both federal and Utah law.

130.    Based on information and belief, Sundahl, Deru and/or Halliday never file for registration with the Utah Department of Commerce, Division of Securities for the sale of an interest in the Dinar Trading Investment to Fellows as required pursuant to Utah Code Ann. § 61-1-1, et seq.

131.    Throughout the rest of 2014 and into 2015, Sundahl and/or Deru contacted Fellows virtually every month asking him to prepare payoff amounts on the Vernal/Chicken Plant/Dinar Trading Investment and the Model Home Notes based on the repeated promises that the returns in the Dinar Trading Investment were forthcoming and were sufficient not only to make all payments under the Vernal/Chicken Plant/Dinar Trading Invest and the Model Home Notes, with accrued interest, but that even more profits would be paid; this Fellows faithfully did.

132.    During this time, Sundahl and/or Deru contacted Fellows assuring him that payment under the Dinar Trading Investment was forthcoming; that they had received checks, transfers and/or funds that they were simply waiting to be "cleared" before payments to Fellows could be made.

133.    Sundahl, Deru and/or Halliday never made a single payment to Fellows.

134.    These communications are well documented and demonstrate Sundahl's, Deru's and/or Halliday's awareness of the obligations and affirmation that was still owed Fellows under the Vernal/Chicken Plant/Dinar Trading Investment, as well as the Model Home Notes.

**The Dinars for Oil Investment.**

135.     In early 2015, Sundahl and/or Deru contacted Fellows in response for Fellows inquiry about promised payments from the Vernal/Chicken Plant/Dinar Trading Investment and the Model Home Notes and wanted to meet. This Fellows agreed to do.

136.     At this meeting, Sundahl and/or Deru represented that because Fellows was losing patience in getting paid through the Vernal/Chicken Plant/Dinar Trading Investment to cover both the amounts promised under this investment, but also the payment on the Model Home Notes, that Sundahl and/or Deru proposed that there was new investment opportunity using the Iraqi Dinars that they had purchased with the Retirement Fund Payment to purchase oil that thereafter could be sold for significant profits in the market in US dollars (the "Dinars to Oil Investment").

137.     At that time, Sundahl and/or Deru represented that the Dinars to Oil Investment would be significantly faster to realize the profits promised Fellows under the Vernal/Chicken Plant/Dinar Trading Investment.

138.     At that time, Sundahl and/or Deru represented that the Dinars to Oil Investment would generate not only enough profit to cover the promise return to Fellows under the Vernal/Chicken Plant/Dinar Trading Investment, but also enough to payoff the Model Home Notes, with accrued interest.

139.     At that time, Sundahl and/or Deru represented that they continued to partner with Halliday, and his law firm, HW&M, in the Dinars to Oil Investment, to facilitate the investing the Dinars in oil and then selling the oil at a significant profit in US dollars, and that Halliday,

and his law firm, HW&M, act as "paymaster" to assure that all profits were properly accounted for and given to Fellows.

140.     At that time, Sundahl and/or Deru represented that not only was Halliday involved in the Dinar to Oil Investment, but that Halliday's father, also a partner and principal at HW&M was involved in the Dinar to Oil Investment with other investors and was the paymaster in controlling the funds being so traded.

141.     Again, Fellows simply asked that Sundahl and/or Deru return the Retirement Fund Payment.

142.     In response Sundahl and/or Deru told Fellows that Equifund Capital did not have funds to return the Retirement Fund Payment, that the Retirement Fund Payment had already been re-invested in the Dinars to Oil Investment and that he would still receive all of the investment promises that Sundahl, Deru and/or Halliday had made pertaining to the Vernal/Chicken Plant/Dinar Trading Investment, in the Dinars to Oil Investment. Fellows was left with no other option than to waited for the promised payments now in the supposed Dinars to Oil Investment.

143.     Sundahl, Deru and/or Halliday did not provide Fellows any written information pertaining to the Dinars to Oil Investment.

144.     Sundahl, Deru and/or Halliday did not provide Fellows with a registration statement in accord with the Securities Act for the Dinars to Oil Investment.

145.     Sundahl, Deru and/or Halliday did not provide Fellows with a private placement document in accord with any of the exemptions from registration under the Regulation D Rules (17 C.F.R. § 230.501, et seq.) for the Dinars to Oil Investment.

146.    Sundahl, Deru and/or Halliday did not provide Fellows with an accredited investor questionnaire, verification or certification (self or otherwise) for the Dinars to Oil Investment.

147.    Sundahl, Deru and/or Halliday did not request any verification from Fellows that he might be a qualified accredited investor for the Dinars to Oil Investment.

148.    Sundahl, Deru and/or Halliday did not provide or request any accredited investor confirmation for Fellows from an investment adviser, attorney, banker, CPA or other third-party qualified to so opine for Fellows for the Dinars to Oil Investment.

149.    At all times relevant Fellows was not an accredited or sophisticated investor.

150.    At all times relevant, Fellows reasonably relied on the representations from Deru about the trustworthiness of Sundahl and Halliday about the Dinars to Oil Investment.

151.    At all time relevant, Fellows reasonably relied on the affirmative representations made by Sundahl, Deru and/or Halliday pertaining to the appropriateness of the Dinars to Oil Investment for his retirement funds.

152.    Based on information and belief, the Dinars to Oil Investment was a scam; there was no investment to use Dinars to purchase oil.

153.    Fellows' investment by way of the Retirement Fund Payment in the Dinars to Oil Investment constitutes a security under both federal and Utah law.

154.    Based on information and belief, Sundahl, Deru and/or Halliday never file for registration with the Utah Department of Commerce, Division of Securities for the sale of an interest in the Dinars to Oil Investment to Fellows as required pursuant to Utah Code Ann. § 61-1-1, et seq.

26

155.    Throughout the rest of 2015, Sundahl and/or Deru contact Fellows nearly every month or so asking him to prepare payoff amounts on the Vernal/Chicken Plant/Dinar Trading/Dinars to Oil Investment and the Model Home Notes based on the repeated promises that the investments in the Dinars to Oil Investment were forthcoming and were sufficient not only to make all payments under the Vernal/Chicken Plant/Dinar Trading/Dinars to Oil Investment and the Model Home Notes, with accrued interest, but that even more profits would be paid; this Fellows faithfully did. Sundahl, Deru and/or Halliday never make a single payment.

156.    During this time, Sundahl and/or Deru contacted Fellows assuring him that payment under the Dinar to Oil Investment was forthcoming; that they had received checks, transfers and/or funds that they were simply waiting to be "cleared" before payments to Fellows could be made.

157.    Sundahl, Deru and/or Halliday never made a single payment to Fellows.

158.    These communications are well documented and demonstrate Sundahl's, Deru's and/or Halliday's awareness of the obligations and affirmation that they still owed Fellows under the Vernal/Chicken Plant/Dinar Trading/Dinar to Oil Investment, as well as the Model Home Notes.

## FEDERAL LAW CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Private Right of Action under the Exchange Act for Fraud in
Connection with the Purchase and Sale of Securities)
Violations of Section 10b of the Exchange Act and Rule 10b-5 thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

159.    Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 158, above.

160.    Deru, Sundahl and Halliday, and each of them, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of emails, the mails, in connection with the purchase or sale of securities, with scienter, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices, or course of business that operated or would operate as a fraud and deceit upon other persons.

161.    By reason of the foregoing, Deru, Sundahl and Halliday, and each of them, violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b) and Rule 10-b thereunder (17 C.F.R. § 240.10b-5).

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

## SECOND CAUSE OF ACTION
(Private Right of Action under the Securities Act
for the Offer and Sale of Unregistered Securities)
Violation of Sections 5(a), 5(c) and 12(a)(1) of the Securities Act)
[15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1)]

162.    Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 161, above.

163.    Deru, Sundahl and Halliday, and each of them, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or emails, the mails, offered to sell or sold securities

or, directly or indirectly, or carried such securities through emails, the mails or in interstate commerce, for the purpose of sale or delivery after sale.

164.    No registration statement has been filed with the Commission or has been in effect with respect to these securities.

165.    By reason of the foregoing, Deru, Sundahl and Halliday, directly or indirectly violated Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a) and 77e(c)).

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

### THIRD CAUSE OF ACTION
(Private Right of Action under the Securities Act
for the Recession of Offer and Sale of Unregistered Securities)
Violation of Section 12(a)(2) of the Securities Act [15 U.S.C. § 771(a)(2)]

166.    Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 165, above.

167.    Deru, Sundahl and Halliday, directly or indirectly, made use of email, the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase and sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker-dealer registered with the Commission.

168.    By reason of the foregoing, Deru, Sundahl and Halliday violated Section 15(a) of the Exchange Act (15 U.S.C. 78o(a)).

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

## PENDANT STATE CAUSES OF ACTION

### FOURTH CAUSE OF ACTION
(Right of Private Action under Utah Securities Act for the Sale
of Securities by Means of Untrue Statements and Material Omissions)
[Utah Code §§ 61-1-22 and 61-1-1(2)]

169.    Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 168, above.

170.    The Vernal/Chicken Plant/Dinar Trading/Dinars to Oil Investment sold by Sundahl, Deru and/or Halliday to Fellows constitute a security within the meaning of Utah Code Ann. § 61-1-13.

171.    In connection with the offering of securities in the Vernal/Chicken Plant/Dinar Trading/Dinars to Oil Investment, Fellows invested in, and expected to receive, an ownership interest in the Vernal Investment, the Chicken Plant Investment, the Dinars Trading Investment, and the Dinar to Oil Investment. This did not happen.

172.    In connection with the purchase and sale of the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, throughout the course of dealings with Fellows, Deru, Sundahl and/or Halliday willfully (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Fellows in connection with the Retirement Fund Payment in the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment.

173.    Further, in an effort to induce Fellows to invest his money, and/or delay taking action on any potential concern that might develop regarding his ownership interest in the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, Sundahl, Deru and/or Halliday willfully (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Fellows in connection with his investment with Sundahl, Deru and/or Halliday.

174.    Fellows suffered damages in that he made the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment in reliance upon the negligent and misleading statements of Deru, Sundahl and/or Halliday, as alleged with particularity herein.

175.    Fellows would not have made the Retirement Fund Payment to Sundahl, as recommended by Deru and/or Halliday, to participate in the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, or the Dinars to Oil Investment, if he had been aware of the true facts concerning the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment or the conduct of Sundahl, Deru and/or Halliday, as, based on information and belief, known or should have been known by Sundahl, Deru and/or Halliday, as alleged with particularity herein.

176.    Fellows only discovered the true facts concerning these transactions in January 2016 when he retained counsel and began investigating the facts relating to Deru, Sundahl, and/or

31

Halliday, the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment. Prior to that time, defendants actively concealed the true facts from Fellows.

177.    Deru's, Sundahl's and/or Hallidsay's conduct, as alleged herein, constitutes violations of the Utah Securities Act, and specifically Utah Code Ann. § 61-1-1.

178.    At the time Deru, Sundahl and/or Halliday made the representations or omitted to state material fact in connection with the investment of the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment, as well as the status of the Model Home Transactions, knew all of the material facts upon which Fellows' claims in this matter are based.

179.    Deru's, Sundahl's and/or Halliday's representations in connection with the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment, the sale of the Model Homes and the Model Home Notes, as alleged herein were untrue statements of material facts and Deru, Sundahl and/or Halliday omitted to state material facts concerning the sale of these securities to Fellows.

180.    Deru, Sundahl and/or Halliday are or were control persons jointly and severally liable for all acts alleged herein pursuant to Utah Code Ann. § 61-1-22(1) and (4).

181.    Because Deru, Sundahl and/or Halliday as alleged herein were reckless and intentional Fellows is entitled to receive treble damages, costs, and attorney's fees pursuant to Utah Code Ann. § 61-1-22(2).

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

**FIFTH CAUSE OF ACTION**
(Right of Private Action under Utah Securities Act for Failure to Register)
[Utah Code §§ 61-1-22 and 61-1-7]

182.    Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 181, above.

183.    Sundahl, Deru and/or Halliday directly offered and sold securities, or were material participants in such sales to Fellows in Utah.

184.    The Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment and the Dinars to Oil Investment constitute unregistered securities.

185.    Sundahl, Deru and/or Halliday had no reasonable basis and took no reasonable steps to determine whether Fellows was an accredited investor, as defined in Regulation D promulgated by the Commission.

186.    As Fellows was not determined, as required by law, as an accredited investor, there is no applicable federal or state exemption from registration for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment and the Dinars to Oil Investment, and a registration of the securities was mandatory.

187.    No registration statement for these securities was filed, or was in effect, in accordance with federal securities requirements; the securities offered and sold by Sundahl, Deru and/or Halliday were not registered under the Utah Securities Act; and Sundahl, Deru and/or Halliday did not file any claim of exemption relating to the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment or the Dinars to Oil Investment.

188.    Sundahl, Deru and/or Halliday had the ability to control, and had knowledge and/or culpably participated to a significant degree in violations of the securities laws and are

33

therefore jointly and severally liable for the violations in accordance with Section 61-1-22(4) of the Utah Securities Act.

189.    Fellows is entitled, as a direct cause of action, to recover under this cause of action of all of his investment losses as set forth in this complaint under this cause of action against those directly engaged in the sale of securities or who were knowingly material participants. Fellows assert that Sundahl, Deru and/or Halliday was either a seller or a material participant, and that each is therefore jointly and severally liable to Fellows under this cause of action.

190.    Further, under Section 61-1-22(2) of the Utah Securities Act, Sundahl, Deru and Halliday are liable to Fellows, jointly and severally, and Fellows is entitled to recover, separate from their actual losses as alleged with particularity herein, treble damages, court costs and all incurred attorney fees, upon a showing that such misrepresentations, omissions, or sale of unregistered securities were made intentionally or recklessly, as defined under the Utah Securities Act. Such conditions do in fact exist and Fellows, therefore, is entitled to such relief, as set out in this paragraph.

191.    Pursuant to the provisions of Section 61-1-22 of the Utah Securities Act, Fellows is further entitled to judgment for interest on all amounts awarded under this section at a rate of twelve percent (12%) per annum.

192.    Fellows is entitled to recover all such damages under Section 61-1-22, as previously set out, as to each Sundahl, Deru and Halliday, jointly and severely.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

## SIXTH CAUSE OF ACTION
(Fraudulent Transfer)
[Utah Code Ann. § 25-6-1, et seq., [UFTA]]

193.     Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 192, above.

194.     Deru, Sundahl and/or Halliday have engaged in fraudulent transfers, including, but not limited to allegedly taking the Retirement Fund Payment and using it for their own purposes, including the Vernal Investment, the Chicken Plan Investment, the Dinar Trading Investment, or the Dinars to Oil Investment, under Utah Code Ann. § 25-6-1, et seq. (the UFTA) for which Fellows seeks to have the transfers undone.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

## <u>COMMON LAW CLAIMS</u>

## SEVENTH CAUSE OF ACTION
(Fraudulent Misrepresentation)

195.     Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 194, above.

196.     Sundahl, Deru and/or Halliday made certain representations in connection with the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment, the sale of the Model Homes, and the Model Home Notes to Fellows as alleged with particularity herein.

197.     Sundahl's, Deru's and/or Halliday's representations concerned then existing material facts were false, and Sundahl, Deru and/or Halliday knew that their representations were false when made, as alleged with particularity here.

35

198.     Alternatively, Sundahl's, Deru's and/or Halliday's misrepresentations were made recklessly, knowing that they had insufficient knowledge upon which to base such representations, as alleged with particularity herein.

199.     Sundahl's, Deru's and/or Halliday's false representations were made in order to induce Fellows to make the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment, and sell the Model Homes, as alleged with particularity herein.

200.     Fellows reasonably relied on Sundahl's, Deru's and/or Halliday's false representations, and was unaware of their falsity, as alleged with particularity herein.

201.     Fellows only discovered the true facts concerning these transactions in January 2016 when he retained counsel and began investigating the facts relating to his investment. Prior to that time, Sundahl, Deru and/or Halliday actively concealed the true facts from Fellows, as alleged with particularity herein.

202.     In reliance on Sundahl's, Deru's and/or Halliday's false representations, Fellows made the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment, sold the Model Homes to Sundahl/Equifund Capital and entered into the Model Home Notes.

203.     As a direct and proximate result of Sundahl's, Deru's and/or Halliday's false representations, Fellows has been damaged in the amount of not less than $2,103,508, as proven at trial, but in no event less than the amounts of his principal investment in the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment, and the principal amount of the Model Home Notes.

204.     Sundahl's, Deru's and/or Halliday's fraud constitutes willful and malicious conduct with a manifest disregard of, and a knowing and reckless indifference for, the rights of Fellows and, as such, Fellows is entitled to punitive damages in an amount of not less than $6,310,524, as proven at trial.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

### EIGHTH CAUSE OF ACTION
(Fraudulent Inducement and Recession)

205.     Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 204, above.

206.     As alleged herein, Sundahl, Deru and/or Halliday made false and misleading statements to Fellows and omitted to state material facts with the specific intent to fraudulently induce Fellows to make the Retirement Fund Payment in the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment.

207.     Sundahl, Deru and/or Halliday knew that such statements and omissions were intentionally false and misleading, and involved material facts about the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, as alleged with particularity herein.

208.     Sundahl, Deru and/or Halliday made the statements and omissions with the intent that Fellows would rely on such false and misleading statements and omissions, and agree to make the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, as alleged with particularity herein.

209.     In making these decisions, Fellows reasonably relied on the false, misleading, and negligent statements and omissions, as alleged with particularity herein.

210.     Fellows only discovered the true facts concerning these transactions in January 2016 when he retained counsel and began investigating the facts relating to his investment. Prior to that time, Sundahl, Deru and Halliday actively concealed the true facts from Fellows, as alleged with particularity herein.

211.     Based on Sundahl's, Deru's and/or Halliday's fraudulent inducement, Fellows is entitled to rescind its investment in the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

## NINTH CAUSE OF ACTION
(Promissory Estoppel)

212.     Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 211, above.

213.     Sundahl, Deru and/or Halliday made representations and promises in connection with the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, as well as the Model Homes Notes, as set forth with particularity herein.

214.     Fellows acted with prudence and in reasonable reliance upon Sundahl's, Deru's and/or Halliday's promises and representations in making his decisions to make the Retirement Fund Payment, to sell the Model Homes to Sundahl and to accept the Model Home Notes.

215.    Sundahl, Deru and/or Halliday knew that Fellows would rely and relied upon their representations and promises in connection with the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment, and interest in the Model Homes, as alleged with particularity herein.

216.    Fellows only discovered the true facts concerning these transactions in January 2016 when he retained counsel and began investigating the facts relating to his investment. Prior to that time, defendants actively concealed the true facts from Fellows, as alleged herein.

217.    As a direct and proximate result of Fellows' reliance on Sundahl's, Deru's and/or Halliday's promises and representations, Fellows have been damaged in the amount of not less than $2,103,508, as proven at trial.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

## TENTH CAUSE OF ACTION
(Civil Conspiracy)

218.    Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 217, above.

219.    Sundahl, Deru and Halliday, and each of them, knowingly joined and entered into a conspiracy to, among other things, defraud Fellows, as alleged with particularity herein.

220.    Pursuant to the conspiracy Sundahl, Deru and Halliday, and each of them, agree to make false and misleading statements to Fellows as alleged herein or to make material omissions, and to engage in conduct with the specific intent to defraud and harm Fellows, as alleged with particularity herein.

221.     Each of the misrepresentations and omissions alleged herein were overt acts undertaken in furtherance of these conspiracies, as alleged with particularity herein.

222.     Fellows reasonably relied on the false, misleading and negligent statements and missions that were part of the conspiracy in making the Retirement Fund Payment, to sell the Model Homes to Sundahl and to accept the Model Home Notes.

223.     As a direct and proximate result of Sundahl's, Deru's and Halliday's conspiratorial acts, Fellows has been damaged in an amount not less than $2,103,508, as proven at trial.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

## ELEVENTH CAUSE OF ACTION
(Breach of Contract)

224.     Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 223, above.

225.     As detailed above, Sundahl and Equifund Capital entered into two promissory notes with Fellows to pay for the Model Homes.

226.     The Lot 218 Note contained the following relevant provisions:

      a.     In consideration for value received (Lot 218);

      b.     Equifund Capital and Sundahl would pay Fellows $74,930.80;

      c.     Together with interest from the date of the note at a rate of ten percent (10%) per annum of the unpaid balance;

      d.     The entire unpaid principal together with interest due in full before thirty (30) days from the date of the note; and

e.      Any installments of principle and interest not paid when due shall, at the option of the legal holder hereof, bear interest thereafter at the rate of twenty-four percent (24%) per annum until paid.

227.    The Lot 214 Note contained the following relevant provisions:

a.      In consideration for value received (Lot 214);

b.      Equifund Capital and Sundahl would pay Fellows $107,375.67;

c.      Together with interest from the date of the note at a rate of ten percent (10%) per annum of the unpaid balance;

d.      The entire unpaid principal together with interest due in full on July 31, 2010; and

e.      Any installments of principle and interest not paid when due shall, at the option of the legal holder hereof, bear interest thereafter at the rate of twenty-four percent (24%) per annum until paid.

228.    The Lot 218 Note came due on May 7, 2010, but neither Equifund Capital nor Sundahl ever made a payment on the Lot 218 Note.

229.    Equifund Capital nor Sundahl paid the principal or the interests, and have to date not made a single payment there toward the Lot 218 Note.

230.    The Lot 214 Note came due on July 31, 2010, but neither Equifund Capital nor Sundahl ever made a payment on the Lot 214 Note.

231.    Equifund Capital nor Sundahl paid the principal or the interests, and has to date not made a single payment there toward the Lot 214 Note.

232.     From and after the time that the Model Homes Notes became due, Sundahl has made repeated assurances that he would make payments, including principal and accrued interest on the Model Homes Notes to Fellows, including reaffirming these obligations to Fellows.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

**TWELFTH CAUSE OF ACTION**
(Fraud)

233.     Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 232, above.

234.     As alleged herein, Sundahl, Deru and/or Halliday made representations of fact in connection with the offerings of Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, the Dinars to Oil Investment and the sale of the Model Homes, and in an effort to induce Fellows to make the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, to sell of the Model Homes to Sundahl and the acceptance of the Model Home Notes, as alleged with particularity herein.

235.     These representations were false, and Sundahl, Deru and/or Halliday knew that these representations were false when made, as alleged with particularity herein.

236.     The false representations were made in order to induce Fellows to invest to make the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, to sell of the Model Homes to Sundahl and the acceptance of the Model Home Notes, as alleged with particularity herein.

237.    Fellows reasonably relied on Sundahl's, Deru's and/or Halliday's false representations, and was unaware of their falsity, as alleged with particularity herein.

238.    In reliance on Sundahl's, Deru's and/or Halliday's false representations, Fellows made the Retirement Fund Payment for the Vernal Investment, the Chicken Plant Investment, the Dinar Trading Investment, and the Dinars to Oil Investment, sold of the Model Homes to Sundahl and accepted of the Model Home Notes, as alleged with particularity herein.

239.    Fellows only discovered the true facts concerning these transactions in January 2016 when he retained counsel and began investigating the facts relating to his investment. Prior to that time, defendants actively concealed the true facts from Fellows, as alleged herein.

240.    As a direct and proximate result of Sundahl's, Deru's and/or Halliday's false representations, Fellows has been damaged in the amount of $2,103,508.

241.    Sundahl's, Deru's and/or Halliday's fraud constitutes willful and malicious conduct with a manifest disregard of, and a knowing and reckless indifference for, the rights of Fellows and, as such, Fellows is entitled to punitive damages in an amount to be proven at trial, but in no event less than $6,310,524.

**WHEREFORE**, Fellows demands judgment against defendants, as set-forth in his Prayer for Relief.

### THIRTEENTH CAUSE OF ACTION
(Piercing the Corporate/LLC Veil; Alter Ego)

242.    Fellows realleges and incorporates by reference the allegations contained in paragraphs 1 through 241, above.

**Equifund Capital and Sundahl.**

243.    Based on information and belief, Sundahl exercised complete control and domination of the finances, policy, and business practices of Equifund Capital to such an extent that Equifund Capital had no separate mind, will, or existence of its own; that there was such a unity of interest and ownership between Equifund Capital and Sundahl that any separate personalities between Equifund Capital and Sundahl no longer exists.

244.    Based on information and belief, corporate formalities were not observed by Sundahl of Equifund Capital and no other party play any functioning role with respect to the operations of Equifund Capital.

245.    Based on information and belief, in his position as the dominant shareholder, president and dominant director of Equifund Capital, and any other officers of Equifund Capital did not play any functioning role with respect to the operations of Equifund Capital.

246.    Based on information and belief, in his position as the dominant shareholder, president and dominant director of Equifund Capital, Sundahl treated the bank accounts of Equifund Capital as his own, and he siphoned funds for his own benefit.

247.    Based on information and belief, as alleged with particularity herein, Sundahl used Equifund Capital to perpetuate a fraud, violations of federal and state securities laws, and/or promote injustices as against Fellows.

248.    Based on information and belief, Equifund Capital is the alter ego of Sundahl, and the corporate entity should be disregarded and Equifund Capital and Sundahl should be treated as one and the same person for purposes of liabilities incurred by either Sundahl or Equifund Capital.

**Belsen Getty and Deru.**

249.     Based on information and belief, Deru exercised control and domination of the finances, policy, and business practices of Belsen Getty to such an extent that Belsen Getty had no separate mind, will, or existence of its own; that there was such a unity of interest and ownership between Belsen Getty and Deru that any separate personalities between Belsen Getty and Deru no longer exists.

250.     Based on information and belief, Deru and no other party play any functioning role with respect to the operations of Belsen Getty.

251.     Based on information and belief, in his position as the dominant member and manager of Belsen Getty, and any other member and/or manager of Belsen Getty did not play any functioning role with respect to the operations of Belsen Getty.

252.     Based on information and belief, in his position as the dominant member and manager of Belsen Getty, Deru treated the bank accounts of Belsen Getty as his own, and he siphoned funds for his own benefit.

253.     Based on information and belief, as alleged with particularity herein, Deru used Belsen Getty to perpetuate a fraud, violations of federal and state securities laws, and/or promote injustices as against Fellows

254.     Based on information and belief, Belsen Getty is the alter ego of Deru, and the corporate entity should be disregarded and Belsen Getty and Deru should be treated as one and the same person for purposes of liabilities incurred by either Deru or Belsen Getty.

**HW&M and Halliday.**

255.    Based on information and belief, Halliday exercised control and domination of the finances, policy, and business practices of HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.) to such an extent that HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.) had no separate mind, will, or existence of its own; that there was such a unity of interest and ownership between HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.) and Halliday that any separate personalities between HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.) and Halliday no longer exists.

256.    Based on information and belief, Halliday and no other party play any functioning role with respect to the operations of HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.).

257.    Based on information and belief, in Halliday's position as the dominant shareholder, president and dominant director of HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.), and any other officers of HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.) did not play any functioning role with respect to the operations of HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.).

258.    Based on information and belief, in his position as the dominant shareholder, president and dominant director of HW&M and/or its predecessors during the relevant time

herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.), Halliday treated the bank

accounts of HW&M and/or its predecessors during the relevant time herein (e.g., Halliday &

Halliday, P.C., Halliday & Watkins, P.C.) as his own, and he siphoned funds for his own benefit.

259.    Based on information and belief, as alleged with particularity herein, Halliday

used HW&M and/or its predecessors during the relevant time herein (e.g., Halliday & Halliday,

P.C., Halliday & Watkins, P.C.) to perpetuate a fraud, violations of federal and state securities

laws, and/or promote injustices as against Fellows

260.    Based on information and belief, HW&M and/or its predecessors during the

relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.) is the alter ego

of Halliday, and the corporate entity should be disregarded and HW&M and/or its predecessors

during the relevant time herein (e.g., Halliday & Halliday, P.C., Halliday & Watkins, P.C.) and

Halliday should be treated as one and the same person for purposes of liabilities incurred by

either Halliday or HW&M and/or its predecessors during the relevant time herein (e.g., Halliday

& Halliday, P.C., Halliday & Watkins, P.C.).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Randy W. Fellows prays for judgment as against each

defendant as follows:

1.    Awarding Fellows compensatory damages in an amount to be proven at trial, but

in no event less than $2,103,508, jointly and severally, as provided under the Exchange Act, the

Securities Act, the Utah Securities Act, and the common law;

2.    For an order rescinding the purchase that Fellows made and placing the parties in

the position they held with respect to each other immediately prior to Fellows making the

Retirement Fund Payment, selling the Model Homes to Sundahl or accepting the Model Homes Notes from Equifund Capital and Sundahl, as provided under the Exchange Act and the common law.

3.       Awarding Fellows pre-judgment and post-judgment interest at the rate of twelve percent (12%) per annum pursuant to the Utah Securities Act;

4.       Awarding Fellows his attorneys' fees, expert witness fees, and other costs pursuant to the Utah Securities Act;

5.       Awarding Fellows treble damages in an amount to be proven at trial, but in no event less than $750,000 under the Utah Securities Act;

6.       Awarding Fellows punitive damages in an amount to be proven at trial, but in no event less than $6,310,524; and

7.       For such other and further relief as the Court deems equitable and just in the circumstances.

**JURY DEMAND**

Fellows demands a trial by jury.

**DATED** this 13th day of July 2016.

HOLMAN WALKER, LC

By _/s/_____
     Jeffrey N. Walker
     Chase M. Walker
     Attorneys for Plaintiff

Address of Plaintiff Randy W. Fellows:
12268 South 900 East, Suite 304
Draper, Utah 84020